**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 22, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

SENECA INSURANCE COMPANY,
INC., a foreign corporation,

    Plaintiff-Appellant/Cross-Appellee,

v.

WESTERN CLAIMS, INC., a for profit
Oklahoma corporation; LOU BARBARO,
individually and as agent and employee of
Western Claims, Inc.,

    Defendants-Appellees/Cross-Appellants.

Nos. 13-6284 and 14-6002

_____

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:12-CV-00141-HE)**

_____

Murray E. Abowitz, Abowitz, Timberlake & Dahnke, P.C., Oklahoma City, Oklahoma,
for Plaintiff-Appellant/Cross-Appellee, Seneca Insurance Company.

Maurice G. Woods, II, McAtee and Woods, P.C., Oklahoma City, Oklahoma, for
Defendants-Appellees/Cross Appellants, Western Claims, Inc., et al.

_____

Before **GORSUCH**, **MURPHY**, and **MORITZ**, Circuit Judges.

_____

**MORITZ**, Circuit Judge.

_____

Seneca Insurance Company paid $1 million to settle a lawsuit in which its insured alleged Seneca had mishandled insurance claims for hail damage to the insured's property. Seeking to recoup the costs of defending and settling the lawsuit, Seneca brought this action for implied equitable indemnity and negligence against its insurance adjuster, Western Claims, Inc., and Western Claims' agent Lou Barbaro (together "Western Claims").

The district court allowed Western Claims to discover and admit as evidence at trial correspondence containing advice from Seneca's lawyers regarding the underlying hail damage claim and litigation. It concluded Seneca put the advice at issue in this lawsuit, thereby waiving any attorney-client privilege or work-product protection. The jury ultimately found in Western Claims' favor.

In this appeal, Seneca seeks a new trial, arguing the district court erred in concluding Seneca put the legal advice at issue. Western Claims cross appeals, contending that even if the district court erred, Western Claims is nevertheless entitled to judgment as a matter of law on both of Seneca's claims.

Exercising jurisdiction under 28 U.S.C. § 1291, we conclude that because Seneca cited "advice of counsel" to justify settling with its insured in the underlying action, Seneca could not shield that advice from Western Claims. Because we affirm the district court's conclusion that Seneca waived any attorney-client privilege or work-product protection, we do not reach Western Claims' cross appeal.

**BACKGROUND**

Seneca hired Western Claims to investigate a claim by Route 66 Trader Market

d/b/a Laser Expedition for wind and hail damage to buildings Seneca insured. Western Claims assigned adjuster Lou Barbaro to investigate the claim.

Barbaro inspected Route 66's buildings and concluded the buildings had sustained hail damage but the metal roof on Route 66's large, flea-market-style building had not been damaged. Barbaro estimated Route 66's net claim to be about $1,081. Seneca promptly issued a check to Route 66 for that amount and closed its file.

Nearly eight months later, Route 66 asked Seneca to reopen Route 66's hail damage claim based on a new estimate from Route 66's roofing contractor indicating the roof of the large building had sustained hail damage in the amount of $759,607.77. Seneca refused to pay, insisting the roof had not been damaged.

Route 66 eventually sued Seneca, Western Claims, and Barbaro in Oklahoma state court, claiming all three had mishandled its claims. Against Seneca, Route 66 alleged breach of insurance contract, bad faith, and fraud, seeking extra-contractual and punitive damages.

During the Route 66 litigation, John Mrakovcic, Seneca's Claims Examiner, prepared and distributed a Large Loss Report to several individuals, including Frank Donahue, Seneca's Vice President of Claims, and Marc Wolin, Seneca's Chief Operating Officer. The loss report suggested a settlement range of $200,000 to $500,000, and a potential jury verdict range of $300,000 to $1,500,000, while establishing reserves for the suit at $345,000. Seneca later obtained an estimate for replacing the large metal roof, and paid Route 66 $151,685.17, the undisputed amount of the damage minus the applicable

3

deductibles. This payment did not, however, resolve Route 66's claims for extra-contractual and punitive damages.

For assistance defending the Route 66 lawsuit, Seneca sought advice from two attorneys in separate firms, James N. Isbell and Murray E. Abowitz. About the time Mrakovcic issued his loss report, he received correspondence from Isbell detailing Seneca's handling of Route 66's damage claim, summarizing Oklahoma law regarding Route 66's bad faith claim, and making suggestions regarding Seneca's appraisal or replacement options. Isbell also suggested Seneca's failure to pay Route 66's damage claim could be viewed as unreasonable and unjustified, leaving Seneca vulnerable to Route 66's bad faith claim, and therefore punitive damages.

About four months later, Mrakovcic received correspondence from Abowitz highlighting Seneca's potential vulnerabilities and identifying several potential flaws with both Seneca's and Western Claims' handling of Route 66's claim. In his correspondence, Abowitz advised that even Seneca's "best defense," *i.e.*, attributing all the bad faith conduct to Barbaro, would not allow it to escape liability on Route 66's bad faith claim. He further warned that if a jury found Seneca acted in bad faith, it might award punitive damages, which would be difficult to shift to Western Claims. Ultimately, Abowitz recommended Seneca avoid an adverse jury verdict and possible punitive damages by settling the Route 66 litigation and then suing Western Claims and Barbaro to recover the cost of settlement, blaming them for mishandling Route 66's claims.

Consistent with Abowitz's advice, after Route 66 voluntarily dismissed its claims against Western Claims and Barbaro, Seneca settled with Route 66 for $1 million in "new

4

money." Seneca then filed this suit asserting implied equitable indemnity and negligence claims against Western Claims and Barbaro. Specifically, Seneca alleged Barbaro caused any mishandling of Route 66's claims by misleading Seneca to conclude Route 66's roof had sustained no hail damage. Seneca sought to recover the $1 million it had paid to settle the Route 66 litigation, plus $64,079.14 in costs it incurred defending the suit.

In discovery, Seneca disclosed a claim note that stated Seneca had settled the Route 66 litigation for "$1 million dollars new money" "on advice of Counsel." Western Claims then filed a motion seeking to compel Seneca to produce, among other things, documents Seneca relied on in settling the Route 66 litigation. Seneca responded, claiming attorney-client privilege and work-product protection justified its refusal to produce the Isbell and Abowitz correspondence. Over Seneca's objection, the district court granted Western Claims' motion to compel.

Shortly before trial and again at trial, Seneca moved to prohibit Western Claims from introducing the Isbell and Abowitz correspondence. Seneca reiterated its assertion that the documents were subject to attorney-client privilege and work-product protection. The district court denied both motions, finding Seneca had placed the advice at issue. The district court later admitted the correspondence for the limited purpose of establishing Seneca's reasons for settling the Route 66 litigation and the basis for the amount of the settlement.

At trial, Mrakovcic testified he relied on the Isbell and Abowitz correspondence in handling the Route 66 claim. Further, Mrakovcic testified that Gregory Crapanzano, Seneca's Vice President of Property Claims, told him Seneca settled the Route 66

5

litigation for $1 million based on Abowitz's advice. Crapanzano also testified that his "conversations with counsel" as well as "conversations with the home office" and his superiors led him to conclude that $1 million was a "reasonable settlement" because a jury might have awarded Route 66 $2.5 million.

Donahue, Seneca's Vice President of Claims, and Wolin, its Chief Operating Officer, both testified they relied on "advice of counsel"—particularly Abowitz's advice—in settling the Route 66 litigation for $1 million instead of the $200,000 to $500,000 range suggested in the loss report.

At the close of Seneca's case-in-chief, the district court granted Western Claims' Rule 50 motion for judgment as a matter of law as to Seneca's equitable indemnity claim. However, the court permitted Seneca's negligence claim to go to the jury, which ultimately found in favor of Western Claims.

Seneca appeals the district court's decision allowing Western Claims to discover and introduce as evidence at trial the Isbell and Abowitz correspondence. Western Claims conditionally cross appeals the district court's denial of its Rule 50 motion as to Seneca's negligence claim.

## DISCUSSION

Seneca argues the district court erred in concluding Seneca waived its attorney-client privilege and work-product protection as to the Isbell and Abowitz correspondence. We review district court decisions regarding waiver of attorney-client privilege and work-product protection for abuse of discretion. *Frontier Ref., Inc. v. Gorman-Rupp Co.*, 136 F.3d 695, 699 (10th Cir. 1998). But we review the district court's underlying factual

6

findings for clear error and its rulings on purely legal questions *de novo*. *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1112 (10th Cir. 2001).

## I.    "At-Issue" Waiver of Attorney-Client Privilege

Because this diversity suit arises under Oklahoma law, Oklahoma law governs the contours of the attorney-client privilege. Fed. R. Evid. 501. As we summarized in *Frontier Refining, Inc. v Gorman-Rupp Co.*,136 F.3d 695 (10th Cir. 1998), courts generally apply one of three approaches to determine whether a litigant has waived the attorney-client privilege:

> The *first* of these general approaches is the "automatic waiver" rule, which provides that a litigant automatically waives the privilege upon assertion of a claim, counterclaim, or affirmative defense that raises as an issue a matter to which otherwise privileged material is relevant. *See Independent Prods. Corp. v. Loew's Inc.*, 22 F.R.D. 266, 276-77 (S.D.N.Y. 1958) (originating "automatic waiver" rule); *see also* FDIC v. Wise, 139 F.R.D. 168, 170-71 (D. Colo. 1991) (discussing *Independent Productions* and "automatic waiver" rule). The *second* set of generalized approaches provides that the privilege is waived only when the material to be discovered is both relevant to the issues raised in the case and either vital or necessary to the opposing party's defense of the case. *See Black Panther Party v. Smith*, 661 F.2d 1243, 1266-68 (D.C. Cir. 1981) (balancing need for discovery with importance of privilege), *vacated without opinion*, 458 U.S. 1118, 102 S. Ct. 3505, 73 L. Ed. 2d 1381 (1982); *Hearn v. Rhay*, 68 F.R.D. 574, 581 (E.D. Wash. 1975) (setting forth three-factor test, which includes relevance and vitality prongs). *Finally*, several courts have recently concluded that a litigant waives the attorney-client privilege if, and only if, the litigant directly puts the attorney's advice at issue in the litigation. *See, e.g.*, *Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851, 863-64 (3d Cir. 1994) (adopting restrictive test and criticizing more liberal views of waiver).

136 F.3d at 699-700 (emphasis added).

The Oklahoma Supreme Court has not definitively adopted any of these

approaches, but the parties agree Oklahoma courts would apply some version of the second approach, *i.e.*, the *Hearn* test. *See* Aplt. Br. 14-17; Aplt./Cross-Aplee. Resp. & Reply 5; Aplee./Cross-Aplt. Principal & Resp. Br. 20-22; *see also Gilson v. State*, 8 P.3d 883, 908-09 (Okla. Crim. App. 2000) (applying version of *Hearn* test); *see also Lindley v. Life Invs. Ins. Co. of Am.*, 267 F.R.D. 382, 392-393 (N.D. Okla. 2010), *aff'd in part as modified*, 08-CV-0379-CVE-PJC, 2010 WL 1741407 (N.D. Okla. Apr. 28, 2010) (applying *Hearn* test).

> Under the *Hearn* test, "at-issue" waiver requires—
>
> (1) assertion of the privilege was the result of some affirmative act, such as filing suit, by the asserting party;
>
> (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; *and*
>
> (3) application of the privilege would have denied the opposing party access to information vital to [its] defense.

*Frontier*, 136 F.3d at 701 (quoting *Hearn*, 68 F.R.D. at 581) (formatting altered; emphasis and brackets in original).

Here, Western Claims argues Seneca's assertion of attorney-client privilege undoubtedly resulted from affirmative acts by Seneca—*i.e.*, Seneca filed suit against Western Claims to recover the cost of the Route 66 settlement and then relied on "advice of counsel" as a basis for its settlement with Route 66.

Further, Western Claims asserts that the Isbell and Abowitz correspondence is relevant to the reasonableness of the Route 66 settlement because the correspondence explains Seneca's rationale for settling as well as the amount of the settlement. Seneca

concedes that to succeed on its indemnity and negligence claims, it was required to prove the "underlying reasonableness of" its settlement with Route 66. *See* Aplt./Cross-Aplee. Resp. & Reply, at 6; *see also Caterpillar Inc. v. Trinity Indus., Inc.*, 134 P.3d 881, 885 (Okla. Civ. App. 2005) (stating party is entitled to indemnity for cost of settlement when indemnitor is legally liable and settlement was reasonable and in good faith); *cf. St. Paul Reins. Co. v. Club Servs. Corp.*, 30 F. App'x 834, 836 (10th Cir. 2002) (holding insurer could recover from its agent the cost of settling insured's lawsuit for mishandling her insurance application to the extent the agent caused the insurer's alleged damages (citing *Washington v. Mechanics & Traders Ins. Co.*, 50 P.2d 621, 624 (Okla. 1935); Okla. Stat. tit. 23, § 61)) (unpublished).

Seneca contends, however, that this application of the first two prongs of the *Hearn* test creates a "meaningless threshold" that would allow admission of any potentially relevant advice from an attorney. Seneca's argument both misapprehends the crucial "affirmative act" requirement and downplays its conduct in this action. Here, Seneca affirmatively put at issue its attorney's advice by invoking "advice of counsel" to support its claims in this litigation. Thus, the first two prongs of the *Hearn* test were met in this case.

Focusing on the third *Hearn* prong, Seneca contends its assertion of attorney-client privilege would not have denied Western Claims access to information "vital" to its defense because the information in the Isbell and Abowitz correspondence was available through other sources. Seneca argues *Frontier* controls this question.

In *Frontier*, the plaintiff, Frontier Refining, Inc., settled personal injury claims

resulting from an explosion at its refinery. Frontier Refining then sued Gorman-Rupp for implied equitable indemnity alleging a defective Gorman-Rupp pump caused the explosion that resulted in the personal injuries. *Frontier*, 136 F.3d at 699. Finding the advice of Frontier Refining's counsel relevant to determining the reasonableness of the personal injury settlements, the district court allowed Gorman-Rupp to discover and admit at trial Frontier Refining's counsel's files from the underlying personal injury suits. *Id.* at 701.

A panel of this court reversed, holding "[m]ere relevance . . . is not the standard" for determining at-issue waiver. Instead, the panel held the "information must also be 'vital,' which necessarily implies the information is available from no other source." *Id.* The panel further concluded that because "Gorman-Rupp had access to information regarding the reasonableness of the settlement and Frontier's motivations for settling through witnesses other than Frontier's attorneys," the "privileged and protected information at issue was not truly 'vital' to Gorman-Rupp's defense." *Id.* at 701-02.

Seneca contends *Frontier*'s holding requires reversal because, like Gorman-Rupp, Western Claims had access to information regarding the reasonableness of the Route 66 settlement from sources other than the Isbell and Abowitz correspondence. This case, however, differs significantly from *Frontier* in that the "other sources"—namely Seneca's officers—generally did not rely on their own reasons for settling with Route 66 for $1 million. Instead, they chose to rely on "advice of counsel" to justify the reasonableness of the settlement.

In contrast, in *Frontier*, the company "did not rely on the [attorney] work product

10

in any manner to justify its right to recovery or to respond to Gorman-Rupp's defense that the initial settlements were not reasonable." *Id.* at 704. And nothing in the *Frontier* decision suggests the company relied on attorney-client-privileged advice to justify the settlements.

Indeed, in *Frontier* the court framed the issue as whether "Frontier had waived its attorney-client privilege in *bringing* th[e] indemnity action against Gorman-Rupp." *Id.* at 700 (emphasis added). Here, Seneca not only sued Western Claims, it expressly relied on "advice of counsel" as a reason—if not the primary reason—for settling the Route 66 lawsuit for $1 million.

Further, allowing Seneca to rely on "advice of counsel" to establish the reasonableness of the Route 66 settlement while excluding the contents of that advice would violate the well-established principle that "attorney-client communications cannot be used both as a sword and a shield." *See Motley v. Marathon Oil Co.*, 71 F.3d 1547, 1552 (10th Cir. 1995); *see also Frontier*, 136 F.3d at 700 (bringing indemnity suit does not impliedly waive attorney-client privilege unless plaintiff asserts reliance on advice of counsel to prove reasonableness of underlying settlement); EDWARD J. IMWINKELRIED, THE NEW WIGMORE: EVIDENTIARY PRIVILEGES, § 6.12.4 (2014) (noting thrust of "in issue" doctrine is that party's privilege cannot be used as both shield and sword).

Based on the facts and circumstances of this case, we conclude the district court did not abuse its discretion in concluding Seneca waived attorney-client privilege as to the Isbell and Abowitz correspondence.

## II.     "At-Issue" Waiver Of Work-Product Protection

Although attorney-client privilege and work-product doctrine are separate and distinct concepts, neither the parties nor the district court distinguished between the two for purposes of determining at-issue waiver. Like the attorney-client privilege, "a litigant cannot use the work product doctrine as both a sword and shield by selectively using the privileged documents to prove a point but then invok[e] the privilege to prevent an opponent from challenging the assertion." *Frontier*, 136 F.3d at 704. For the reasons stated above, Seneca waived work-product protection by putting the correspondence at issue.

## CONCLUSION

The district court's judgment is affirmed.