**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 17, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

BURBIDGE MITCHELL & GROSS,
a general partnership,

     Plaintiff - Appellant/
     Cross-Appellee,

v.

PAUL H. PETERS, an individual,

     Defendant - Appellee/
     Cross - Appellant,

and

TIMOTHY OLSON, an individual;
KENNETH W. GRISWOLD, an
individual; C AND M PROPERTIES,
LLC, a Utah limited liability company;
HIGH MOUNTAIN PARTNERS, a Utah
limited liability company; JJRRNL TRUST
1998; DOES 1 - 10,

     Defendants - Appellees.

Nos. 14-4066 & 14-4080
(D.C. No. 2:11-CV-00640-DB)
(D. Utah)

_____

**ORDER AND JUDGMENT**[*]
_____

_____

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Before **HOLMES**, **BACHARACH**, and **MORITZ**, Circuit Judges.
_____

This diversity case involves the tort of wrongful use of civil proceedings.  The

case was filed by the Utah law firm of Burbidge, Mitchell & Gross (BMG) against

former client C&M Properties, LLC (C&M), which had sued BMG for legal

malpractice.[1]  BMG also named as defendants C&M's manager, certain current and

former members of C&M, their counsel and related entities.

The federal district court granted summary judgment motions filed by the

defendants, and BMG now appeals.  The district court also sanctioned two of the

defendants under Fed. R. Civ. P. 11.  One of the sanctioned defendants, Paul H.

Peters, cross-appeals.  Exercising jurisdiction under 28 U.S.C. § 1291, we affirm the

district court's orders in the appeal and the cross-appeal.

## I.  WRONGFUL USE OF CIVIL PROCEEDINGS

### A.  Background

As this court has previously observed, this case is "an already overlong and

overly complex matter."  *In re C&M Props., L.L.C. (C&M Props., L.L.C. v.

Burbidge)*, 563 F.3d 1156, 1168 (10th Cir. 2009).  To avoid making it even more so,

we recount only those facts necessary to the resolution of the instant appeal and

cross-appeal.

---

[1] "Prior to 2006, BMG was known as Burbidge and Mitchell."  Aplt. App.,
Vol. I at 46.  Although much of this case occurred while the firm operated as
Burbidge and Mitchell, we refer to the firm throughout this order and judgment as
BMG for simplicity's sake.

2

C&M was formed in June 1997 for the purpose of developing real property. Its initial members included Raymond Klein, Robert Sacks, Kenneth Griswold, and later, Griswold's company, Wolf Mountain Resorts, L.C. Klein was C&M's day-to-day manager. Paul Peters served as counsel to Wolf Mountain.

In 1998, C&M learned of an opportunity to acquire a parcel of real property known as the "Weight Parcel." When the members of C&M discovered that one of their own, Sacks, had arranged to buy the parcel for himself, Klein hired BMG, which had represented Klein in a prior matter known as the Keyvani Action. Eventually, the Weight Parcel matter was settled, with C&M obtaining an option to buy part of the parcel and agreeing to buy out Sacks' interest in C&M.

To fund Sacks' removal, C&M found an investor, Timothy Olson. In September 1999, Olson bought into C&M through his company, High Mountain Partners, LLC, which he managed as trustee of the JJRRNL Trust 1998. Following an amendment to C&M's operating agreement, the membership interests in C&M were as follows: Klein (32.5%); Wolf Mountain (32.5%); High Mountain (25%); and John Shirley (10%).

Over the ensuing months, various disputes arose among the members and/or their attorneys. For instance, represented by BMG, C&M sued Peters and Wolf Mountain, claiming that Peters had fraudulently altered the size of a C&M easement to benefit a company he controlled. Additionally, BMG "helped Klein draft a letter," Aplt. App., Vol. III at 800, threatening to "deny Mr. Griswold any rights to manage [C&M], and any rights as a member," *id.*, Vol. I at 205-06. Still yet another dispute

3

resulted in litigation pursued by BMG on behalf of C&M against Wolf Mountain, Griswold, and Peters, accusing them of interfering with attempts to develop and sell C&M's real property.

By April 2001, C&M was in financial distress and its members were divided. In particular, Klein recommended to Olson and Shirley that they "meet with the attorneys and finish a plan that does as much damage to . . . Wolf [Mountain] as possible." Aplee. Suppl. App., Vol. V at 1225. In turn, Olson expressed his dissatisfaction with Klein's management of C&M over "the past 18 months" and with "continu[ing] to be the source for all [of C&M's] cash needs." Aplt. App., Vol. IV at 1080.

Near the end of July 2001, Olson met with Peters and discussed the appearance that BMG's loyalty was divided between Klein and C&M. They also discussed obtaining "disinterested impartial counsel [for C&M]" and removing Klein as a C&M manager. *Id.*, Vol. III at 968.

On September 5, 2001, BMG withdrew as C&M's counsel when Olson declined to further fund C&M's litigation costs. Several days later, Olson called a meeting of the members to consider, among other things, "claims the Company may have against attorneys, members and managers," Aplee. Suppl. App., Vol. V at 1255. Klein forwarded the meeting's agenda to BMG, retrieved numerous documents from C&M's files held by BMG, and prohibited BMG from releasing any C&M files without his authorization.

4

On October 30, 2001, Olson and Griswold (through High Mountain and Wolf Mountain, respectively) utilized their combined majority membership interests in C&M to remove Klein as a manager, citing, among other things, his failure to disclose that "Richard Burbidge and Jefferson Gross . . . are his attorneys in direct conflict of interest of [C&M]." Aplt. App., Vol. I at 290. Olson also initiated a complaint with the Utah State Bar, claiming that BMG "used their position as [C&M's] lawyers to benefit Mr. Klein personally." Aplee. Suppl. App., Vol. V at 1350.

In December 2001, C&M filed for bankruptcy protection. C&M's bankruptcy plan was approved and became effective in October 2002, resulting in High Mountain becoming the sole member of C&M and Olson becoming the sole manager.

In January 2003, C&M sued BMG for legal malpractice in Utah state court. C&M alleged that BMG had (1) breached its fiduciary duties to C&M by failing to disclose its prior and continuing representation of Klein; and (2) negligently advised C&M "to unilaterally cancel and disregard the ownership equity and management interests of Wolf Mountain." Aplt. App., Vol. I at 64, 69. C&M further alleged that if it had known of BMG's "conflict of interest and divided loyalty," it would not have followed the "ruinous advice and methods of [BMG]." *Id.* at 65.

BMG immediately removed the malpractice case to the federal bankruptcy court and moved for dismissal. In July 2003, a bankruptcy judge construed the motion as seeking summary judgment, and, in the course of denying it, found that "[p]rior to and during C&M's representation by [BMG], Klein was separately and

5

personally represented by [BMG]." *Id.*, Vol. II at 430. A six-year odyssey through the federal courts ensued. Finally, in 2009, this court placed the matter firmly back in the state court, *see In re C&M Props.*, 563 F.3d at 1167-68, where BMG obtained summary judgment in April 2011.

With its victory in hand, BMG then sued Olson, Griswold, Peters, C&M, High Mountain, and the JJRRNL Trust in Utah state court for "initiating and pursuing" the legal malpractice case. Aplt. App., Vol. I at 53. BMG's complaint contained three causes of action: (1) wrongful use of civil proceedings; (2) civil conspiracy; and (3) aiding and abetting. The defendants removed the case to federal court based on diversity jurisdiction and they moved for summary judgment. The district court granted the defendants' motions, finding "that C&M had facts sufficient to justify its belief that BMG had breached the fiduciary duties owed to C&M and to reasonably believe that it could potentially convince a judge or jury to rule in its favor." *Id.*, Vol. VII at 2415.

Additional background for the cross-appeal, which involves Rule 11 sanctions against Peters, will be provided below in Part II.

### B. Standards of Review

"We review the district court's summary judgment order de novo, and apply the same legal standards as the district court." *Doe v. City of Albuquerque*, 667 F.3d 1111, 1122 (10th Cir. 2012). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When applying this

6

standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Doe*, 667 F.3d at 1122 (internal quotation marks omitted). Nevertheless, "[a] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013) (internal quotation marks omitted).

### C. Discussion

Because the tort of wrongful use of civil proceedings has the potential to deter litigants from pursuing potentially valid suits, it is disfavored. *Anderson Dev. Co., L.C. v. Tobias*, 116 P.3d 323, 339 (Utah 2005). Consequently, a plaintiff advancing that tort must show not only a favorable termination of the prior proceedings (except when they are ex parte), but also that those proceedings were initiated (1) without probable cause; and (2) "primarily for a purpose other than that of securing the proper adjudication of the claim." *Id.* at 340-41 (internal quotation marks omitted).

Like the district court, we resolve the instant case on the element of probable cause, which in this context means a reasonable belief "in the existence of the facts upon which the claim is based" and a correct or reasonable belief "that under those facts the claim may be valid under the applicable law." *Gilbert v. Ince*, 981 P.2d 841, 845-46 (Utah 1999) (internal quotation marks omitted). This is not a demanding requirement, as "[p]robable cause to institute civil proceedings requires no more than a reasonable belief that there is a *chance* that a claim may be held valid upon

7

adjudication." *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 62-63 (1993) (emphasis added) (brackets and internal quotation marks omitted).

In this case, the defendants identified ample evidence that could have given rise to a reasonable belief that BMG breached its fiduciary duties to C&M by representing Klein and/or favoring his interests, leading ultimately to C&M's bankruptcy:[2]

> • BMG represented Klein, both before and after C&M's formation, in the Keyvani action, which involved allegations that Klein had usurped a real estate opportunity brought to him. Although the Keyvani action settled shortly after C&M's June 1997 formation, as late as June 1999, BMG had created a "New Client (Matter) Clearance Report" in a matter designated as "Ray Klein v. Wolf Mountain." Aplee. Suppl. App., Vol. V at 1155. The report also prominently noted that BMG attorneys Burbidge and Gross had "[p]ossible [c]onflicts" with the new case. *Id.*[3]

---

[2] To the extent BMG suggests that we are confined in our summary judgment analysis to only the evidence "considered in the district court's written decision," Aplt. Reply Br. at 21, it is well established that "[w]e may affirm on any basis supported by the record, even though not relied on by the district court," *McCarty v. Gilchrist*, 646 F.3d 1281, 1285 (10th Cir. 2011) (internal quotation marks omitted).

[3] BMG argues in its reply brief that "[t]here is no evidence that Olson had possession of the new client memo before C&M filed the malpractice action" in 2003 and that "[i]f the new client memo was not reviewed before the malpractice action was filed, it could not have provided Olson probable cause for the malpractice action." Aplt. Reply Br. at 28. The logic of BMG's argument is clear, but BMG offers nothing but speculation in its reply brief that the memo was not part of the documents possessed by Olson before the malpractice action began. Speculation is insufficient to defeat summary judgment. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

8

• BMG authored correspondence suggesting it was representing Klein's interests rather than C&M's interests in the Weight Parcel matter. *See* Aplt. App., Vol. I at 195 ("[W]e have been retained by . . . Klein to protect and pursue his interests respecting C&M . . . ."). And BMG consistently pursued litigation against C&M member Wolf Mountain and helped Klein threaten Griswold concerning C&M membership rights.

• As relationships among the C&M members further deteriorated in the fall of 2001, Klein warned BMG that C&M's members were meeting to discuss "claims the Company may have against attorneys, members and managers," Aplee. Suppl. App., Vol. V at 1255. Not long afterward, BMG allowed Klein to retrieve "numerous documents" from C&M's files," ROA, Vol. V at 1556; *see also* Aplee. Supp. App., Vol. XI at 2994 (showing 12,498 pages were removed by Klein), and BMG complied with Klein's directive to refuse the release of C&M files to anyone else without his authorization.

• And in the bankruptcy court, after BMG's removal of the malpractice case, the judge found that BMG had concurrently represented Klein and C&M.

BMG argues, however, that a rational jury would find that the defendants lacked probable cause because they "pursued the malpractice action for unjustified reasons." Aplt. Opening Br. at 34. BMG claims the malpractice action was in reality (1) retaliation against BMG for suing Griswold and Peters, and (2) "for Olson[ ] to secure Peters and Griswold's assent to C&M's bankruptcy settlement." *Id.* at 35. But we are not concerned here with whether the legal malpractice action was brought for an improper purpose—the second element of the wrongful-use-of-civil-proceedings tort. Rather, our focus is on the first element, probable cause, which requires an assessment of the reasonableness of the defendants' beliefs in the factual and legal bases for a malpractice action.

9

In regard to that assessment, BMG offers numerous arguments—none of which are persuasive. First, BMG contends Olson knew that BMG had represented Klein in the Keyvani Action because Klein disclosed that fact when Olson was considering buying into C&M. But the evidence BMG cites for that purported disclosure— Klein's deposition—is not supportive. Specifically, Klein testified that he told Olson that BMG had represented him in a prior transaction, but Klein could not recall explaining "what the nature of the representation was." Aplt. App., Vol. III at 940-41.

Next, BMG claims the evidence sufficiently demonstrates there was no concurrent representation of Klein and C&M regarding the Weight Parcel. BMG asserts that it "represented that it was acting for the protection of C&M's interest in the Weight Parcel opportunity, not Klein's." Aplt. Opening Br. at 42. The record paints a different picture, however. In its February 1999 correspondence to Sacks, BMG states: "[W]e have been retained *by Raymond O. Klein* to protect and pursue *his* interests respecting C&M." Aplt. App., Vol. I at 195 (emphasis added).

BMG further contends that even if the defendants reasonably believed there was concurrent representation, "it was not reasonable for [them] to believe that a conflict of interest arose." Aplt. Opening Br. at 42. BMG again incorrectly characterizes the evidence as showing that "BMG consistently represented that it was acting for Klein on behalf of *C&M's* interests." *Id.* at 43 (emphasis added). As we have already pointed out, BMG's February 1999 correspondence states that it was representing *Klein's* own interests. And to the extent that BMG contends Klein's

10

interests were consistent with C&M's interests, the contention is wholly conclusory. *See Nahno-Lopez v. Houser*, 625 F.3d 1279, 1285 (10th Cir. 2010) ("Conclusory legal statements cannot preclude summary judgment.").

BMG claims "Olson testified that C&M had no evidence that BMG had committed any malpractice." Aplt. Opening Br. at 49. In support of that significant claim, BMG directs our attention to eighty-four pages of the record. We decline to scour this portion of an already enormous record for evidence in opposition to summary judgment. *See Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1246 n.13 (10th Cir. 2003). What we have uncovered, however, with just a cursory review of this portion of the record, is testimony from Olson that malpractice was suspected at least as early as December 2001, and that the suspicion gained traction during the final stages of the bankruptcy proceeding in 2002 when C&M obtained documents "relating to [BMG's] representation of C&M." Aplt. App., Vol. V at 1717. Thus, contrary to BMG's assertion, Olson has not admitted the malpractice action had no evidentiary support.

BMG next argues it was error for the district court to derive probable cause from BMG's billing statements and Olson's consultations with attorneys about suing BMG. We need not decide, however, whether the district court erred in these

respects, as we review the district court's summary judgement order de novo and we are not considering either type of evidence as demonstrating probable cause.[4]

BMG also argues that the bankruptcy court's finding of concurrent representation cannot be used to show probable cause because the finding was made six months after C&M filed the legal malpractice case. The finding is relevant, however, because BMG sued the defendants not just for initiating the malpractice case, but also for the "continued prosecution of the Malpractice Action." Aplt. App., Vol. I at 53.

Finally, BMG argues that even if Olson had probable cause for C&M's lawsuit, Peters and Griswold did not. To prevail on this argument, BMG would have to overcome two hurdles. First, BMG would have to show that Peters and Griswold "active[ly] part[icipated] in" C&M's lawsuit, *see Gilbert*, 981 P.2d at 845 (internal

---

[4] We note, however, that while "advice of counsel is a protection[,] even though it consists merely of an opinion that the facts so known or believed afford a chance . . . that the claim asserted in the civil proceedings may be upheld," Restatement (Second) of Torts, § 675, cmt. g (1977), the defense was not pled by Olson. Although Griswold pled the defense, he provides scant argument to support its invocation. We generally do not consider "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation." *Murrell v. Shalala*, 43 F.3d 1388, 1390 n.2 (10th Cir. 1994). Peters likewise pled the defense, but he does not adequately address BMG's contention that he could not simultaneously claim that he relied on the advice of counsel and then invoke the attorney-client privilege to prevent discovery of the substance of counsel's advice. *See Seneca Ins. Co. v. W. Claims, Inc.*, 774 F.3d 1272, 1277-78 (10th Cir. 2014) ("[A]llowing [a defendant] to rely on 'advice of counsel' . . . while excluding the contents of that advice would violate the well-established principle that attorney-client communications cannot be used both as a sword and a shield." (internal quotation marks omitted)). Consequently, our decision as to probable cause does not rest on the advice-of-counsel defense.

quotation marks omitted), despite the fact that Wolf Mountain (which was represented by Peters and run by Griswold) was no longer a C&M member when the malpractice suit was filed. Second, BMG would have to show that Peters and Griswold were unaware of the evidence which supports the reasonableness of Olson's decision to sue.

Even if we assume BMG could clear the first hurdle by showing Peters and Griswold had, as BMG maintains, an agreement with Olson to sue in exchange for cooperation in bankruptcy or some mutually beneficial financial arrangement, BMG has not overcome the second hurdle. Specifically, BMG has not identified evidence that would raise a genuine issue of material fact concerning the reasonableness of Peters' and Griswold's belief in the legitimacy of a malpractice action against BMG. In other words, BMG has shown no meaningful basis on which to view the probable cause evidence in this case as applying to only Olson. Instead, BMG posits that C&M's lawsuit was "a pretext for Peters['] and Griswold's true retaliatory motives." Aplt. Opening Br. at 57. But as we stated earlier, our concern here is not whether the lawsuit was brought for an improper purpose.

We conclude that no reasonable jury could have found that C&M's lawsuit was unsupported by probable cause. Consequently, the district court properly granted the defendants' motions for summary judgment.[5]

---

[5] BMG's conspiracy and aiding/abetting causes of action fail without a valid underlying tort. *See Estrada v. Mendoza*, 275 P.3d 1024, 1029 (Utah Ct. App. 2012)

(continued)

13

## II. RULE 11 SANCTIONS

### A. *Background*

Soon after BMG's wrongful-use-of-civil-proceedings action was removed to federal court, Griswold moved to compel arbitration under "the written arbitration clause in the agreement pursuant to which [BMG] was engaged as counsel" in 1999. Aplee. Suppl. App., Vol. I at 47. Griswold stated that while he did not have "a copy of the Engagement Agreement," he understood that it "contained an arbitration provision." *Id.* at 50-51. Peters, who was proceeding pro se, submitted a declaration stating that he was "informed that the Engagement Agreement included a standard form arbitration clause," *id.* at 58, and he joined in Griswold's motion.

In August 2011, BMG's counsel notified Griswold and Peters by letter that BMG would file a Rule 11 sanctions motion if they did not withdraw the motion to compel arbitration. BMG's counsel explained that "[t]he evidence is clear that [BMG] did not enter into a written engagement agreement with [C&M]." *Id.* at 130. Enclosed with the notification letter was the Rule 11 motion, but there was no "supporting memorandum or exhibits." BMG's Response to Cross-Appeal at 56.

Thirty-five days later, on September 7, 2011, BMG filed its Rule 11 motion along with a supporting memorandum, which cited declarations from Klein, Gross, and Burbidge. In November, Peters withdrew his joinder in the motion to compel arbitration, explaining that he had "recently discovered evidence from which

(civil conspiracy); Restatement (Second) of Torts § 876(b) (1979) (aiding and abetting).

14

compulsory counter and cross claims will involve parties and subject matter not encompassed by the current[ ] part[ies'] rights to arbitration." Aplee. Suppl. App., Vol. II at 556.

After a hearing, the district court granted BMG's Rule 11 motion, concluding "that the evidentiary support [for the motion to compel arbitration and the joinder therein] was insufficient." *Id.*, Vol. III at 646. The court explained:

> I don't know if there was an engagement agreement and it contained an arbitration provision. . . . I just know there is not enough evidentiary support to say that there was one.
>
> . . .
>
> I do have enough to say that an insufficient reasonable inquiry was made, that the evidentiary support was insufficient to support the factual contentions, nor did anyone attempt to say that it is likely if we could go into discovery, that it is likely that then we will have evidentiary support after this reasonable opportunity for further investigation.

*Id.* at 645-46. Accordingly, the district court sanctioned Griswold and Peters the sum of $33,622.86, "payable in equal parts by (1) Mr. Griswold and his attorney; and (2) Mr. Peters." *Id.*, Vol. IV at 987.

## B. Standards of Review

We review the district court's imposition of Rule 11 sanctions for abuse of discretion. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990). "A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Id.*

15

*C. Discussion*

Peters first argues that he withdrew his joinder in the motion to compel within Rule 11's twenty-one-day safe-harbor period. *See* Fed. R. Civ. P. 11(c)(2) (providing that a sanctions motion "must not be filed or be presented to the court if the challenged paper . . . is withdrawn . . . within 21 days after service"). But BMG served Peters with a copy of the sanctions motion in August 2011, and he did not withdraw his joinder until November—far outside the safe-harbor period.

Nevertheless, Peters argues that the safe-harbor period did not begin to run until BMG served the memorandum and declarations it ultimately relied on to support the sanctions motion. He seems to rely on local court rules requiring that motions have supporting memoranda. From this requirement, he deduces that a Rule 11 motion lacking such a memorandum is not complete and cannot trigger the safe-harbor period.

Peters' logic is not persuasive. Rule 11 discusses the safe-harbor provision only in terms of "[t]he motion." *See* Fed. R. Civ. P. 11(c)(2). The advisory committee notes to the rule do so as well, explaining that "the 'safe harbor' period beings to run only upon service of *the motion*." *Id.* advisory committee's note to 1993 amendment (emphasis added). "The drafters of the rule surely understood th[e] distinction [between a motion and supporting memoranda] when crafting the safe harbor requirement." *Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 176 (2d Cir. 2012) (per curiam). We thus join the Second Circuit in declining "to read into the rule a requirement that a motion served

16

for purposes of the safe harbor period must include supporting papers such as a memorandum of law and exhibits." *Id.*

We caution, however, that the motion must provide sufficient "notice [of the claimed sanctionable conduct] for the protection of the party accused of sanctionable behavior." *Roth v. Green*, 466 F.3d 1179, 1192 (10th Cir. 2006) (internal quotation marks omitted). We agree with the district court that BMG provided "enough evidentiary support or factual detail or reasoning to put [Griswold and Peters] on notice" of the conduct claimed to be sanctionable—i.e., moving to compel arbitration in the absence of an agreement to arbitrate. Aplee. Suppl. App., Vol. III at 643. Specifically, BMG's sanctions motion warned: (1) there was no "copy of any written engagement agreement containing an agreement to arbitrate"; (2) C&M's former manager, Raymond Klein, "does not know of any written engagement agreement"; (3) BMG partners Burbidge and Gross "testified . . . in their depositions taken in the underlying litigation in May 2010 [that they were unaware of any written engagement agreement]"; and (4) after BMG had delivered "14 boxes of documents" to C&M's bankruptcy counsel, Peters "had not found a retainer agreement" and was told during a C&M meeting that "no member had any knowledge of [such an agreement]." *Id.*, Vol. I at 115-16. This information was sufficient to trigger Rule 11's safe-harbor period.

Peters next challenges the district court's finding that there was insufficient evidentiary support for the existence of an engagement agreement containing an arbitration clause. He maintains that the district court rendered that finding without

17

considering a "secret audio recording[ ]" from 2001 in which Klein tells another

C&M member, "There is a conflict disclaimer that we all signed." Cross-Aplt.

Opening Br. at 54, 55. But Peters does not provide any explanation why we should

overlook the general rule that this court does not consider matters not raised below.

*See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1128 (10th Cir. 2011) (stating that

if a "theory simply wasn't raised before the district court, we usually hold it

forfeited"). And even if he did, we fail to see how the existence of a conflict

disclaimer (shown by hearsay) has any bearing on the existence of an engagement

agreement containing an arbitration clause.

Peters also contests the district court's finding that he failed to conduct a

reasonable inquiry before joining the motion to compel arbitration. He asserts that he

reviewed "thousands of pages of documents and deposition transcripts," Cross-Aplt.

Opening Br. at 57, and learned of an arbitration clause in C&M's internal operating

agreement among its members and in a letter from Gross stating that BMG "did not

enter into a separate written engagement agreement" with C&M, *id.* at 59 (emphasis

omitted). But this information does not at all suggest the existence of an engagement

agreement containing an arbitration clause.

Finally, Peters argues that the district court abused its discretion by not

allowing discovery or conducting a trial on the existence of the engagement

agreement. We disagree. There is no requirement in Rule 11 for a sanctions trial.

Indeed, the Rule 11 advisory committee explains that to minimize "the cost of

satellite litigation over the imposition of sanctions, the [district] court must to the

18

extent possible limit the scope of sanction proceedings to the record." Fed. R. Civ. P. 11 advisory committee's note to 1983 amendment. And even for pre-sanctions discovery, the committee indicates it should be contemplated "only in extraordinary circumstances," *id.*, which Peters has not identified.[6]

### III. CONCLUSION

The judgment of the district court is affirmed. BMG's motion to file a supplemental appendix is granted.

Entered for the Court

Jerome A. Holmes
Circuit Judge

---

[6] To the extent Peters challenges the district court's order denying the motion to compel arbitration, he lacks standing, as he withdrew his joinder in that motion.